## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | ) ) ) | Master File No. 12-md-02311 |
| | ) | Case No. 2:12-cv-00502 |
| In re: | ) ) | Hon. Marianne O. Battani |
| BEARINGS CASES | ) ) | Hon. Mona Majzoub |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | **Jury Trial Demanded** |
| ALL DEALERSHIP ACTIONS | ) ) ) | |

## DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers "), Hammett Motor Company, Inc. ("Plaintiff Hammett "), Superstore Automotive, Inc. ("Plaintiff Superstore "), Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee "), Westfield Dodge City, Inc. ("Plaintiff Westfield "), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P. "), Desert European Motorcars, Ltd.  ("Plaintiff Desert "), Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville "), Dale Martens Nissan Subaru, Inc. ("Plaintiff Dale Martens "), Green Team of Clay Center Inc. ("Plaintiff Green Team "), McGrath Automotive Group, Inc. ("Plaintiff McGrath "), Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock "), Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue "), Landers McLarty Lee's Summit Mo, LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit "), Bonneville and Son, Inc. ("Plaintiff Bonneville "), Holzhauer Auto and Truck Sales, Inc. ("Plaintiff Holzhauer "), Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre "), Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou "),

1

John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene "), SLT Group II, Inc., d/b/a

Planet Nissan Subaru of Flagstaff ("Plaintiff Planet Nissan "), Herb Hallman Chevrolet, Inc., d/b/a/

Champion Chevrolet ("Plaintiff Champion "), Charles Daher's Commonwealth Motors, Inc., d/b/a

Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff

Commonwealth Motors "), Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen

("Plaintiff Commonwealth Volkswagen "), Commonwealth Nissan, Inc., d/b/a Commonwealth

Nissan ("Plaintiff Commonwealth Nissan "), Ramey Motors, Inc. ("Plaintiff Ramey "), Thornhill

Superstore, Inc.,  d/b/a Thornhill GM Superstore ("Plaintiff Thornhill "), Dave Heather

Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland "), Central Salt

Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake

Valley "), Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet "), Capitol Dealerships,

Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota "), Beck Motors, Inc. ("Plaintiff Beck "),

Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade "), John O'Neil Johnson

Toyota, LLC ("Plaintiff Johnson "), Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley "), Lee

Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda "), Lee Auto Malls-Topsham,

Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham "), Landers of Hazelwood, LLC d/b/a

Landers Toyota of Hazelwood ("Plaintiff Hazelwood "), Cannon Chevrolet – Oldsmobile –

Cadillac – Nissan, Inc.  ("Plaintiff Cannon "), Cannon Nissan of Jackson, LLC ("Plaintiff Cannon

Nissan "), Hudson Charleston Acquisition, LLC d/b/a Hudson Nissan ("Plaintiff Hudson Nissan "),

Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer "), and Apex Motor Corporation

("Plaintiff Apex ") (collectively "Plaintiffs "), file this Consolidated Class Complaint on behalf of

themselves and all others similarly situated (the "Classes" as defined below).

Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this lawsuit as a proposed class action against the Defendants (defined below), manufacturers, and suppliers of automotive bearings (defined below) globally and in the United States for engaging in a lengthy conspiracy to suppress and eliminate competition in the bearings industry by agreeing to fix, stabilize, and maintain the prices of these products, which were sold to automobile and other manufacturers in the United States and elsewhere.

2.      "Bearings" refers to automotive bearings. Examples include, but are not limited to, the following products: ball bearings, tapered roller bearings, roller bearings, and mounted bearings.

3.      The "Class Period" refers to January 1, 2004 to the present.

4.      The Defendants manufacture, market, and sell Bearings throughout the United States and in other countries.

5.      Vehicles[1] containing Bearings, as well as Bearings themselves, made by Defendants, are sold in every state of the United States and the District of Columbia.

6.      The Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to fix, stabilize, and maintain the prices of Bearings. They carried out their conspiracy by agreeing, during meetings and conversations, to fix the prices of Bearings.

---

[1] "Vehicles" as used here, means any new vehicles purchased by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

Defendants then sold Bearings at noncompetitive prices to automobile and other manufacturers in the United States and elsewhere, for sale in United States.

7.      Defendants' anticompetitive conduct is also the subject of a global criminal investigation being conducted by competition authorities in the United States, the European Union, South Korea, Singapore, Australia, Canada and Japan.

8.      As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Bearings. The European Commission Competition Authority ("EC") has also conducted raids at the European offices of several of the Defendants.

9.      The JFTC began its investigation in July 2011 after JTEKT Corporation reported the cartel to the JFTC so that it would be given leniency treatment. Officials of NSK Ltd. and Nachi-Fujikoshi Corp. have also admitted their roles in the cartel.

10.     On June 14, 2012, the Japan Fair Trade Commission ("JFTC") filed a criminal accusation alleging a criminal violation of the Japan's Antimonopoly Act against NSK Ltd, NTN Corp., and Nachi-Fujikoshi Corp.

11.     On December 28, 2012, Nachi-Fujikoshi Corp. and two of its executives were convicted in Tokyo District Court of violating Japan's Antimonopoly Act .

12.     On February 25, 2013, Defendant NSK Ltd. announced that the company was sentenced to a penalty of 380 million yen by the Tokyo District Court for violation of the Antimonopoly Act of Japan regarding sales of Bearings as a result of the June 14, 2012 prosecution by the Tokyo District Public Prosecutors Office.  In addition, two of NSK's former officers and a former employee received suspended sentences.

4

13.     On March 29, 2013, the JFTC issued cease and desist orders and surcharge payment orders based on violations of the Japan Antimonopoly Act against NTN Corp., NSK Ltd. and Nachi-Fujikoshi Corp, for conspiring to fix prices on bearings.  It also noted that JTEKT Corp. had violated the Antimonopoly Act through its participation in the conspiracy, but was not subject to the cease and desist order.

14.     JTEKT Corporation has also pleaded guiltily in Canada, to engaging in the Bearings conspiracy, in violation of Canadian competition laws.

15.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Class paid artificially inflated prices for Bearings and for vehicles containing Bearings.  Plaintiffs and the members of the Classes have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367,

because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

18.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

19.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Bearings throughout the United States that were specifically designed for vehicles that were intended to be sold in the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; (d) was through its own actions and through the actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States; (e) targeted customers in the United States, including this district, and/or (f) engaged in actions in furtherance of an illegal conspiracy in this district either itself or through its co-conspirators.  Defendants also conduct business throughout the United States, including in this

district, and they have purposefully availed themselves of the laws of the United States and this district.

20.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anti-competitive effects upon interstate commerce within the United States and upon import trade and commerce into the United States.

21.     The activities of Defendants and their co-conspirators were within the flow of, were intended to have, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products are sold in the flow of interstate commerce.

22.     Bearings manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale and, therefore, constitute import commerce.  To the extent any Bearings are purchased in the United States, and such Bearings do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

23.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Bearings, and that conspiracy unreasonably restrained trade and adversely affected the market for Bearings.

7

24.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Bearings, including Plaintiffs and the Classes

## PARTIES

### The Plaintiffs

25.     Plaintiff Martens is a Maryland corporation with its principal place of business in the District of Columbia.  Plaintiff Martens is an authorized Volvo and Volkswagen dealer which bought Volvo- and Volkswagen-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

26.     During the Class Period Plaintiff Martens purchased vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Plaintiff Martens also purchased Bearings, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Martens purchased and received both the afore-mentioned vehicles and Bearings in the District of Columbia.  Plaintiff Martens has also displayed, sold, and advertised its vehicles in the District of Columbia during the Class Period.

27.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

28.     During the Class Period Plaintiff Hammett purchased vehicles containing Bearings manufactured by Defendants or their co-conspirators.  Plaintiff Hammett also purchased Bearings, manufactured by Defendants or their co-conspirators, for its repair and

service business, during the Class Period.  Plaintiff Hammett purchased and received both the

afore-mentioned vehicles and Bearings in Mississippi.  Plaintiff Hammett has also displayed,

sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

29.    Plaintiff Landers is an Arkansas corporation with its principal place of business in

Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who bought Toyota-

brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-

conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-

conspirators, during the Class Period.

30.    During the Class Period Plaintiff Landers purchased vehicles containing Bearings

manufactured by one or more Defendants or their co-conspirators.  Plaintiff Landers also

purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its

repair and service business, during the Class Period. Plaintiff Landers purchased and received

both the afore-mentioned vehicles and Bearings in Arkansas.  Plaintiff Landers has also

displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

31.    Plaintiff Superstore is a Minnesota company, with its principal place of business

in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing

business under the name White Bear Lake Superstore.  Plaintiff Superstore bought Buick- and

GMC-brand vehicles containing Bearings manufactured by one or more of the Defendants or

their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or

their co-conspirators during the Class Period.

32.    During the Class Period Plaintiff Superstore purchased vehicles containing

Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Superstore

also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for

9

its repair and service business, during the Class Period.  Plaintiff Superstore purchased and

received both the afore-mentioned vehicles and Bearings in Minnesota.  Plaintiff Superstore has

also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

33.    Plaintiff Lee is a Florida corporation, with its principal place of business in Fort

Walton Beach, Florida.  Plaintiff Lee is presently an authorized GMC dealer.  During the Class

Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer.  Plaintiff Lee

buys GMC-brand vehicles containing Bearings manufactured by one or more of the Defendants

or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or

their co-conspirators.  During the Class Period, Plaintiff Lee bought Pontiac-, Oldsmobile-, and

Jeep-brand vehicles containing Bearings manufactured by one or more of the Defendants or their

co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-

conspirators.

34.    During the Class Period Plaintiff Lee purchased vehicles containing Bearings

manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee also purchased

Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and

service business, during the Class Period.  Plaintiff Lee purchased and received both the afore-

mentioned vehicles and Bearings in Florida.  Plaintiff Lee has also displayed, sold, serviced, and

advertised its vehicles in Florida during the Class Period.

35.    Plaintiff Westfield is a New York company with its principal place of business in

Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who bought

Chrysler-, Dodge-, and Jeep-brand vehicles containing Bearings manufactured by one or more of

the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the

Defendants or their co-conspirators during the Class Period.

36.     During the Class Period Plaintiff Westfield purchased vehicles containing Bearings manufactured one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Westfield purchased and received both the afore-mentioned vehicles and Bearings in New York.  Plaintiff Westfield has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

37.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

38.     During the Class Period Plaintiff V.I.P. purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Bearings, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Bearings in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

39.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus, and Spyker dealer who bought Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus-, and Spyker-brand vehicles containing Bearings manufactured by one or more of the Defendants

or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

40.     During the Class Period, Plaintiff Desert purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Desert also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Desert purchased and received both the afore-mentioned vehicles and Bearings in California.  Plaintiff Desert has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

41.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee.  Plaintiff Fayetteville is an authorized Toyota dealer, who bought Toyota-brand cars containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

42.     During the Class Period Plaintiff Fayetteville purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Fayetteville also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Fayetteville purchased and received both the afore-mentioned vehicles and Bearings in Tennessee.  Plaintiff Fayetteville has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

43.     Plaintiff Dale Martens was a Kansas corporation, with its principal place of business in Lawrence, Kansas during the Class Period.  Plaintiff Dale Martens was an authorized Nissan and Subaru dealer during the Class Period, who, during the Class Period, bought Nissan-

and Subaru-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators.

44.     During the Class Period Plaintiff Dale Martens purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Dale Martens also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Dale Martens purchased and received both the afore-mentioned vehicles and Bearings in Kansas.  Plaintiff Dale Martens has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

45.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

46.     During the Class Period Plaintiff Green Team purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Bearings in Kansas.  Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

47.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

48.     During the Class Period Plaintiff McGrath purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Bearings in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

49.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

50.     During the Class Period Plaintiff Table Rock purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Table Rock also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Bearings in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

14

51.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators.

52.     During the Class Period Plaintiff Archer-Perdue purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Archer-Perdue also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Bearings in Nebraska.  Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

53.     Plaintiff Lee's Summit is a Missouri corporation, with its principal place of business in Lee's Summit, Missouri.  Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, Nissan, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, Nissan-, and Ram-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

54.     During the Class Period Plaintiff Lee's Summit purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee's Summit also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee's Summit purchased and received both the afore-mentioned vehicles and Bearings in Missouri.  Plaintiff

15

Lee's Summit has also displayed, sold, serviced and advertised its vehicles in Missouri during the Class Period.

55.     Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

56.     During the Class Period Plaintiff Bonneville purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Bonneville also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Bearings in New Hampshire.  Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

57.     Plaintiff Holzhauer is a Delaware corporation, with its principal place of business in Nashville, Illinois.  Plaintiff Holzhauer is an authorized Dodge, Chrysler, and Jeep dealer, who bought Dodge-, Chrysler-, and Jeep-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

58.     During the Class Period Plaintiff Holzhauer purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Holzhauer also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for

16

its repair and service business, during the Class Period.  Plaintiff Holzhauer purchased and received both the afore-mentioned vehicles and Bearings in Illinois.  Plaintiff Holzhauer has also displayed, sold, serviced, and advertised its vehicles in Illinois during the Class Period.

59.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

60.     During the Class Period Plaintiff Pitre purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Bearings in New Mexico.  Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

61.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

62.     During the Class Period Plaintiff Patsy Lou purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Patsy Lou also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Patsy Lou purchased and

received both the afore-mentioned vehicles and Bearings in Michigan.  Plaintiff Patsy Lou has

also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

63.     Plaintiff John Greene is a North Carolina corporation, with its principal place of

business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge,

Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing

Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as

Bearings manufactured by one or more of the Defendants or their co-conspirators during the

Class Period.

64.     During the Class Period Plaintiff John Greene purchased vehicles containing

Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff John

Greene also purchased Bearings, manufactured by one or more Defendants or their co-

conspirators, for its repair and service business, during the Class Period.  Plaintiff John Greene

purchased and received both the afore-mentioned vehicles and Bearings in North Carolina.

Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North

Carolina during the Class Period.

65.     Plaintiff Planet Nissan is an Arizona corporation, with its principal place of

business in Flagstaff, Arizona.  Plaintiff Planet Nissan is an authorized Nissan and Subaru dealer,

who bought Nissan- and Subaru-brand vehicles containing Bearings manufactured by one or

more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or

more of the Defendants or their co-conspirators during the Class Period.

66.     During the Class Period Plaintiff Planet Nissan purchased vehicles containing

Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Planet

Nissan also purchased Bearings, manufactured by one or more Defendants or their co-

conspirators, for its repair and service business, during the Class Period.  Plaintiff Planet Nissan purchased and received both the afore-mentioned vehicles and Bearings in Arizona.  Plaintiff Planet Nissan has also displayed, sold, serviced, and advertised its vehicles in Arizona during the Class Period.

67.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

68.     During the Class Period Plaintiff Champion purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Champion also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Champion purchased and received both the afore-mentioned vehicles and Bearings in Nevada.  Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

69.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

70.     During the Class Period Plaintiff Commonwealth Motors purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff

19

Commonwealth Motors also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Commonwealth Motors purchased and received both the afore-mentioned vehicles and Bearings in Massachusetts. Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

71.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

72.     During the Class Period Plaintiff Commonwealth Volkswagen purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators. Plaintiff Commonwealth Volkswagen also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Bearings in Massachusetts. Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

73.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts. Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

74.     During the Class Period Plaintiff Commonwealth Nissan purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and Bearings in Massachusetts.  Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

75.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

76.     During the Class Period Plaintiff Ramey purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Bearings in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

77.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Bearings

21

manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

78.     During the Class Period Plaintiff Thornhill purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Thornhill also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Bearings in West Virginia.  Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

79.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

80.     During the Class Period Plaintiff Lakeland purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lakeland also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and Bearings in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

81.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who

bought Buick- and GMC-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

82.     During the Class Period Plaintiff Salt Lake Valley purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Bearings in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

83.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

84.     During the Class Period Plaintiff Capitol Chevrolet purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Bearings in Oregon. Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

85.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

86.     During the Class Period Plaintiff Capitol Toyota purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Bearings in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

87.     Plaintiff Beck is a South Dakota corporation, with its principal place of business in Pierre, South Dakota.  Plaintiff Beck is an authorized Chevrolet and Cadillac dealer, who bought Chevrolet- and Cadillac-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

88.     During the Class Period Plaintiff Beck purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Beck also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Beck purchased and received both the afore-mentioned vehicles and Bearings in South Dakota.  Plaintiff Beck has also displayed, sold, serviced, and advertised its vehicles in South Dakota during the Class Period.

89.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

90.     During the Class Period Plaintiff Wade purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Wade also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Wade purchased and received both the afore-mentioned vehicles and Bearings in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

91.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

92.     During the Class Period Plaintiff Johnson purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Johnson also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Bearings in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

93.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized

25

Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators.

94.     During the Class Period Plaintiff Hartley purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hartley also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Bearings in New York.  Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

95.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine.  Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

96.     During the Class Period Plaintiff Lee Honda purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee Honda also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Bearings in Maine.  Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

97.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine.  Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

98.     During the Class Period Plaintiff Topsham purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.   Plaintiff Topsham also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Topsham purchased and received both the afore-mentioned vehicles and Bearings in Maine.  Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

99.     Plaintiff Hazelwood is an Arkansas corporation, with its principal place of business in Hazelwood, Missouri.  Plaintiff Hazelwood is an authorized Toyota dealer, who bought Toyota-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

100.     During the Class Period Plaintiff Hazelwood purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.   Plaintiff Hazelwood also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hazelwood purchased and received both the afore-mentioned vehicles and Bearings in Missouri.  Plaintiff Hazelwood has also displayed, sold, serviced, and advertised its vehicles in Missouri during the Class Period.

101.     Plaintiff Cannon is a Mississippi corporation, with its principal place of business in Greenwood, Mississippi.  Plaintiff Cannon is an authorized Chevrolet and Cadillac dealer, who bought Chevrolet- and Cadillac-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

27

102.    During the Class Period Plaintiff Cannon purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Cannon also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Bearings in Mississippi.  Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

103.    Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi.  Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

104.    During the Class Period Plaintiff Cannon Nissan purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Cannon Nissan also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Bearings in Mississippi.  Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

105.    Plaintiff Hudson Nissan is a South Carolina limited liability company with its principal place of business in North Charleston, South Carolina.  Plaintiff Hudson Nissan is an authorized Nissan dealer, who bought Nissan-brand cars containing Bearings manufactured by the Defendants or their co-conspirators, as well as Bearings manufactured by the Defendants or their co-conspirators during the Class Period.

106.    During the Class Period Plaintiff Hudson Nissan purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hudson Nissan also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hudson Nissan purchased and received both the afore-mentioned vehicles and Bearings in South Carolina. Plaintiff Hudson Nissan has also displayed, sold, serviced, and advertised its vehicles in South Carolina during the Class Period.

107.    Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont.  Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

108.    During the Class Period Plaintiff Shearer purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Shearer also purchased Bearings manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Bearings in Vermont.  Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

109.    Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont.  Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

29

110.     During the Class Period Plaintiff Apex purchased vehicles containing Bearings manufactured by one or more Defendants or their co-conspirators.  Plaintiff Apex also purchased Bearings, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Apex purchased and received both the afore-mentioned vehicles and Bearings in Vermont.  Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

**The Defendants**

111.     Defendant JTEKT Corporation ("JTEKT Corporation") is a Japanese corporation with its principal place of business in Osaka, Japan. JTEKT— directly and/or through its wholly owned and/or controlled subsidiaries— manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this district, during the Class Period.

112.     Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio. It is a subsidiary of, and wholly-owned or controlled by, its parent, JTEKT. Defendant Koyo manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

113.     JTEKT and Koyo also share and have shared numerous executives.  Hiroyuki Miyazaki, an executive director at JTEKT is also a Director at Koyo.  Noriya Murase, a Senior Executive Director at JTEKT is the former President and Chief  Executive Officer of Koyo.

114.     The message from the Chairman and President at the beginning of JTEKT's 2012 Annual report describes the economic situation in markets targeted by the company.  It states

"there was underlying strength in the U.S. economy, as evidenced by the improved employment situation there."

115.     Defendants Koyo and JTEKT Corporation are collectively referred to as "JTEKT."

116.     Defendant Nachi-Fujikoshi Corp. ("Nachi-Fujikoshi") is a Japanese corporation with its principal place of business in Toyama, Japan. Nachi directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this district, during the Class Period.

117.     Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana. It is a subsidiary of, and wholly-owned or controlled by, its parent, Nachi-Fujikoshi. Defendant Nachi America manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

118.     Nachi America and Nachi-Fujikoshi also share and have shared numerous executives.  Toru Inoue, a corporate officer at Nachi-Fujikoshi, is listed in its 2013 Company Profile as the President of Nachi America Inc., and "[i]n Charge of North & Central America." Nobuo Segawa, a former director at Nachi-Fujikoshi is also a former President of Nachi America.  Makoto Sasaki, a Managing Director and General Manager of Sales Strategy of Nachi-Fujikoshi is the former Chairman of the Board of Nachi America.

119.     Nachi America is referred to in Nachi-Fujikoshi's 2013 Annual Report as one of its "Sales Offices."  Nachi-Fujikoshi's 2013 report also states that one of its management

31

policies is "creating markets in Japan, Europe, and the USA as new volume zones."  Nachi's
company profile indicates that it has been "marketing with large OEM customers . . . in
America" since 1955.

120.    Defendants Nachi America and Nachi-Fujikoshi are collectively referred to as
"Nachi."

121.    Defendant NSK Ltd. ("NSK Ltd.") is a Japanese corporation with its principal
place of business in Tokyo, Japan. NSK— directly and/or through its wholly owned and/or
controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased
throughout the United States, including in this district, during the Class Period.

122.    Defendant NSK Americas, Inc. ("NSK Americas") is a Delaware corporation with
its principal place of business in Ann Arbor, Michigan. It is a subsidiary of, and wholly-owned
or controlled by, its parent, NSK. Defendant NSK Americas manufactured, marketed and/or sold
Bearings that were purchased in the United States, including in this District, during the Class
Period, including by firms that sold such Bearings to Plaintiffs and class members. During the
Class Period, its activities in the United States were under the control and direction of its
Japanese parent, which controlled its policies, sales, and finances.

123.    NSK Ltd.'s annual report sets forth aggregate financials for all of the NSK
entities.  Sales are reported by the sectors the entities supply, such as the Automotive sector,
rather than by subsidiary.

124.    NSK's 2008 report describes its performance in each of its markets.  In doing so it
sets forth one reason for decreased sales in the U.S. "demand in the U.S. for minivans declined,
and total sales was flat in the Americas, year-on-year."  That report also lists one of NSK's
concerns as "a weak U.S. dollar."

125.    NSK Ltd. and NSK Americas have also shared numerous executives.  Bernard Lindsay served as COO for NSK Americas and then as Chief Executive Officer, CEO, and Vice President of NSK Ltd.  Masahide Matsubara, a senior Vice President at NSK, Ltd., is the former Chief Executive Officer of  NSK Americas.

126.    Defendants NSK Ltd. and NSK Americas are collectively referred to as "NSK."

127.    Defendant Schaeffler AG ("Schaeffler AG") is a German corporation with its principal place of business in Herzogenaurach, Germany. Schaeffler— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this district, during the Class Period.

128.    Defendant Schaeffler Group USA Inc. ("Schaeffler Group USA") is a Delaware corporation with its principal place of business in Fort Mill, South Carolina. It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler AG. Defendant Schaeffler Group USA manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members. During the Class Period, its activities in the United States were under the control and direction of its German parent, which controlled its policies, sales, and finances.

129.    Schaeffler Group USA Inc. is described on the Schaeffler website as one of Schaeffeler's "Worldwide Locations."

130.    Schaeffler AG's Q1 Report describes one of the "primary dampers of economic growth" as "the restrictive spending policy in the U.S."

131.    Schaeffler Group USA and Schaeffler AG have shared numerous executives. Klaus Rosenfeld, the Chief Financial Officer and Member of the Executive Manager Board of Schaeffler AG is also the Chief Financial Officer of Schaeffler Group USA.  Dr. Jürgen M.

Geissenger is the CEO of both Schaeffler Group USA and Schaeffler AG.  Georg F.W.

Schaeffler is a Board Member at both Schaeffler AG and Schaeffler Group USA.

132.    Defendants Schaeffler Group USA and Schaeffler AG are collectively referred to

as "Schaeffler."

133.    Defendant AB SKF ("AB SKF") is a Swedish corporation with its principal place

of business in Goteborg, Sweden. SKF directly and/or through its wholly owned and/or

controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased

throughout the United States, including in this district, during, the Class Period.

134.    Defendant SKF USA, Inc. ("SKF USA") is a Delaware corporation with its

principal place of business in Lansdale, Pennsylvania. It is a subsidiary of, and wholly-owned or

controlled by, its parent, AB SKF. Defendant SKF USA manufactured, marketed and/or sold

Bearings that were purchased in the United States, including in this District, during the Class

Period, including by firms that sold such Bearings to Plaintiffs and class members. During the

Class Period, its activities in the United States were under the control and direction of its

Swedish parent, which controlled its policies, sales, and finances.

135.    AB SKF and SKF USA have also shared numerous executives.  Tom Johnstone,

the Chief Executive Officer and President at SKF AB also served as Co-President and Chief

Executive Officer as well as a Director at SKF USA Inc.  Henrik Lange, the Executive Vice

President and Chief Financial Officer of AB SKF,  previously served as President of the

Industrial Division at SKF USA Inc. Poul Jeppesen, the Chief Executive Officer and President of

USA Operations at AB SKF is also the Chief Executive Officer of SKF USA.

136.    SKF reports its sales by business segment, such as the Automotive segment,

rather than by subsidiary.  The sales of SKF USA are not separately reported in SKF's Annual

34

report, rather all automotive OEM sales are reported as part of the Automotive segment. The Automotive segment president, Tryggve Sthen, is located at AB SKF, in Goteborg, Sweden. Mr. Sthen periodically reports on the operations of the Automotive Division, both in SKF's annual report and at periodic presentations to investors. Management in Gothenburg exclusively decides whether to open or close new facilities, regardless of where the facilities will be located.

137.    SKF's 2012 report states that "180 SKF distributors took part in the North American Distributor Convention held in Florida." It states later in the report that it held conventions for distributors in North America, so that they could learn more about SKF's products. SKF's 2012 report also states that " . . . demand continued to be good in both North and Latin America." In addition, the report states that in 2008, SKF acquired PEER Bearings Company, whose "main market" is North America. The report also mentioned that its anti-counterfeiting campaigns are starting to show results in North America.

138.    SKF has an enormous presence in the United States. Approximately 28 of its 140 manufacturing facilities are located in the United States. An average of 5247 persons, or 11.8% of the Group's workforce, were employed in the United States. With respect to SKF as a whole, in 2012, 20% of its sales were made in the USA. With respect to the Automotive Division, in 2012, 19% of its sales were in North America.

139.    Defendants AB SKF and SKF USA are collectively referred to as "SKF."

140.    Defendant NTN Corporation ("NTN Corporation") is a Japanese corporation with its principal place of business in Osaka, Japan. NTN Corporation— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including, in this district, during, the Class Period.

141.     Defendant NTN USA Corporation is a Delaware corporation with its principal place of business in Mount Prospect, Illinois. NTN USA Corporation manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

142.     NTN Corporation and NTN USA have shared a number of executives.  For instance, Tadatoshi Kato, the president of NTN USA is a former Managing Director and Senior Managing Director of NTN Corporation.  Yasunobu Suzuki, the Chairman of the Board and Representative Director at NTN Corporation is the former Chairman of NTN USA.

143.     NTN USA Corp. does not have its own website.  Rather its website is listed on NTN Corporation's website as "NTNAmericas.com."  The homepage of that website indicates that any American entities view themselves as NTN Corporation, their Japanese parent, and not as separate entities.  The website states of "NTN Americas" that "[a]s the world's third largest bearing manufacturer, we have over 68 plants worldwide and nearly 100 years of premium quality to our name."

144.     NTN's 2012 report states that a recovery in customer demand in the automotive market in the Americas helped to increase sales.  In a "Q&A" feature in its 2012 report, NTN, in answer to the question "what is your strategy for industrialized countries in Europe and the Americas" states "we will focus on developing and producing high-value-added products."

145.     Defendants NTN Corporation and NTN USA Corporation are collectively referred to as "NTN."

36

## AGENTS AND CO-CONSPIRATORS

146.    Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged.

147.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

148.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.    The Bearings Industry

149.    Bearings are rolling elements that are used to decrease the rotational friction between a vehicle and the surface it runs on, such as a cemented road. Bearings help maintain balance in the event of speed changes or sudden braking while the automotive vehicle is in motion. Bearings are, among other things, inserted inside the wheels of the vehicle in a special slot called the "cage." The Bearings then rotate around the cage while the vehicle is operating, thereby evenly distributing the load of the vehicle during operation. Bearings serve an essential role in most vehicles because they improve car performance and allow for smooth driving. Bearings are prone to wear and tear, and are usually replaced rather than repaired. See Figure 1.



Figure 1.

150.    Bearings are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process. They are also installed in cars to replace worn out, defective or damaged Bearings.

151.    For new cars, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Bearings directly from Defendants.

152.    JTEKT's main customers include: Toyota, Honda, Ford, GM, Daimler Chrysler, Subaru, Suzuki and BMW.

153.    Nachi states that "60% of all passenger automobiles and light trucks on the road" contain its bearings. Its main customers include Kia, Hyundai, GM, Chrysler, Mercedes, Suzuki and Honda.

154.    Schaeffler describes itself as a supplier to "nearly all automotive manufacturers." Schaeffler's main customers include: Volkswagen, Fiat, Jaguar Land Rover, Porsche, Toyota, BMW, Mercedes, Daimler Chrysler, GM and Ford.

38

155.    NSK's main customers include Honda, Mitsubishi, Nissan and Toyota.

156.    SKF's main customers include: Alfa Romeo, Chrysler, Ferrari, Volvo, BMW, Jaguar, Kia, Nissan, Porsche, Saab, Volkswagen, Mercedes, Ford, General Motors, Audi, Honda, Mazda, Hyundai, and Toyota.

157.    NTN states that "Our ten North American factories have produced millions of automotive bearing and CVJ units for practically every OEM vehicle assembly plant . . ." NTN's main customers include Subaru and Ford.

158.    Defendants and their co-conspirators supplied Bearings to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Bearings (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) abroad for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) abroad for installation in vehicles manufactured abroad for export to and sale in the United States.

159.    Suppliers, including Defendants, supply OEMs with both Bearings to be installed in vehicles and Bearings to be used for replacement purposes.

160.    Replacement Bearings sold by OEMs to dealerships are the same as the Bearings installed in vehicles and are made by the same manufacturer who made the Bearings originally installed—that is the purpose of an OEM part, made by the OEM supplier.  Such replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts.  The prices of replacement Bearings were inflated by Defendants' collusion.

161.    Plaintiffs and members of the proposed Classes indirectly purchased Bearings, either as stand-alone parts, for repair or replacement, or in vehicles containing Bearings.

39

162.    The U.S. market size for Bearings was $2.71 billion in 2008.  See Figure 2.



163.    The Bearings market is dominated and controlled by a small number of manufacturers, which include Defendants.

**B.**    **Defendants Increased Prices for Bearings in the Face of Declining Demand during the Class Period**

164.    The Producer Price Index ("PPI") measures the average change over time in the prices received by domestic producers for their output. The chart below (see Figure 3) provides a 2003-2009 illustration of bearing industry pricing. Because Bearings account for almost 40 percent of the bearings market, the PPI for bearings is a good indicator of the change over time in the prices received by domestic producers of Bearings.

165.    The PPI for bearings suggests that the prices for bearings have increased significantly between January 2004 and February 2009. According to the Bureau of Labor Statistics, the PPI for bearings increased by 32 percent in the period between January 2004 and February 2009.



Figure 3

133.    Meanwhile, according to the auto sales demand curve (see Figure 4 below) by the Bureau of Economic Analysis, from 2003 to the end of 2007, demand for automobiles in the United States has remained sluggish or flat.  The PPI for bearings for the very same period indicates that prices for bearings—and by extension Bearings—were sharply rising (see Figure 2). In the absence of an unlawful price-fixing conspiracy, according to the laws of supply and demand, prices during this period should have followed demand.



Figure 4

134.    From 2008 to 2009, at the height of the recession, the auto industry

experienced a significant 37 percent drop in demand.  *See* Figure 4.  The PPI for bearings for

the very same period indicates that prices for bearings increased by almost 10 percent (see

the steep increase in Figure 3). According to the law of supply and demand, prices during this

period should have fallen, but instead rose.

135.    In a competitive market, falling demand would lead to decreased prices

because competitors would need to lower prices to attract customers and increase demand.

In a market where competitors have engaged in a conspiracy to fix prices, however,

competitors do not lower prices even when faced with decreasing demand. Such price

decreases are unnecessary because the conspirators know that they will not lose sales to

lower-priced competitors.

136.    The price of Bearings increased during the Class Period, even during periods

when demand decreased.  In a competitive market, falling demand should not have resulted

in rising prices for Bearings.  Such anticompetitive price increases have resulted in Plaintiffs'

and members of the Classes paying supracompetitive prices.

42

**B.** **The Structure and Characteristics of the Bearings Market Render the Conspiracy More Plausible.**

166.    The structure and other characteristics of the Bearings market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in these markets.  Specifically, the Bearings market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

### 1.  The Bearings Market Has High Barriers to Entry.

167.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

168.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Bearings market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and longstanding customer relationships.

169.    Research and development is necessary for product innovation because players in this industry compete primarily based on product pricing.  To effectively compete, an entrant must be committed to spending a significant amount of resources on research and development.

170.    Defendants also own several patents for Bearings. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

### 2.   There is Inelasticity of Demand for Bearings.

171.   "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

172.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

173.   Demand for Bearings is highly inelastic. This is because there are no close substitutes for these products.  Additionally, customers must purchase Bearings as essential parts of a vehicle, regardless of whether prices are kept at supra-competitive levels.  Customers wanting to purchase a car simply have no choice but to purchase Bearings.

### 3.   The Market for Bearings is Highly Concentrated.

174.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices. There is a high level of concentration among firms in the Automotive Bearings market.  The top three suppliers of Bearings control nearly 75 percent of the U.S. market.

### 4.   Defendants Had Ample Opportunities to Conspire

175.   Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary

for the operation and furtherance of the conspiracy. According to one confidential witness who was the territory manager of a major Bearings manufacturer, employees of Defendants often ran into and spoke to one another at trade shows.

176.    In addition, SKF, NSK, NTN, Koyo, Nachi and Schaeffler are six of the members of the seven-member World Bearing Association ("WBA"). The WBA is not registered, not incorporated, has no Articles of Association, has no record of any meetings and does not file documents with any government entity globally.

177.    Golf outings organized by distributors presented additional opportunities for employees of the defendant companies to conspire.  It was not uncommon for the golf outings to draw more employees from bearings manufacturers than from distributors.  Thus, manufacturers' employees had an opportunity to meet and were often paired together as part of the golf outing.

178.    During such meetings or golf outings, Defendants and their co-conspirators had the opportunity to engage in private meetings, conversations and communications to discuss pricing and customer allocation for Bearings sold in the United States.

179.    Defendants also had opportunities to conspire and trade information pursuant to the numerous acquisitions in the Bearings industry over the past five years. For example, The Timken Company announced at the end of 2009 that it sold its Needle Roller Bearings business to JTEKT.

180.    On information and belief, Defendants also sell products, including Bearings, to one another as a general business practice.  Defendants and their co-conspirators routinely produced and sold Automotive Bearings to each other.  For example, at times, a particular manufacturer would shut down a product line (i.e. cease production of a particular size or type of bearing) while maintaining the item on its price list.  If a customer ordered a product that was no

45

longer being produced, the nonproducing manufacturer would purchase it from a competitor. To facilitate such purchase and sales transactions, senior level employees, a General Manager or President of the Defendant manufacturer, would meet or communicate to discuss and finalize these arrangements. These transactions provided numerous additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market.

### C.   Government Investigations

181.   Globally-coordinated Investigations into the Bearings industry are underway in the United States, Canada, South Korea, Singapore, Australia, Japan, and Europe.

**DOJ Investigation**

182.   The DOJ is conducting an investigation into the Bearings industry. In November 2011 the DOJ served a subpoena on NTN's "United States consolidated subsidiary requesting the submission of information related to transactions in bearings."  NTN's 2012 report indicated that the U.S.  investigation continues.

183.   Schaeffler similarly reported that it is a subject of the DOJ's bearings antitrust investigation.

184.   NSK's most recent quarterly report states that its subsidiary in the U.S. received a subpoena in connection with the DOJ's Bearings investigation.

185.   SKF's 2012 Annual report indicates that it too is part of the DOJ's investigation.

**Investigation in Japan**

186.   The JFTC launched an investigation in July 2011 after Defendant JTEKT sought leniency by alerting the regulatory agency of the Bearings conspiracy. JTEKT voluntarily confessed to the conspiracy and was exempted from a criminal complaint by the JFTC.

46

187.    On July 26, 2011, the JFTC conducted on-site inspections of Defendants NSK, NTN, JTEKT and Nachi-Fujikoshi amid suspicions that the companies violated Japan's antimonopoly law and fixed prices.

188.    In its 2011 Annual Report, NSK stated that it "intend[ed] to cooperate fully with the [JFTC] investigation" after acknowledging that "in July 2011 the Japan Fair Trade commission conducted on-site investigations of NSK on suspicion that sales of certain products infringed upon Japan's Antimonopoly Act."

189.    NTN reported in its 2011 Financial Report that:

[i]n July, the Company underwent an on-site inspection by the Japan Fair Trade Commission into domestic transactions on bearings, on suspicion that the Company had decided to raise sale prices in cooperation with other manufacturers, and in April this year a search was carried out by special investigators from Tokyo District Public Prosecutor's Office and the Fair Trade Commission.

190.    A press release on JTEKT's website states that it too was inspected by the Tokyo District Public Prosecutor's Office on April 20, 2012.

191.    The Japan Times also has reported that certain NTN officials have made statements admitting to their participation in the conspiracy to fix prices on bearings during voluntary questioning by Japanese prosecutors. Officials of NSK, JTEKT and Nachi-Fujikoshi have already admitted to their roles in the conspiracy.

192.    According to sources, the JFTC said it "believes the culture of collusion is ingrained in the bearing industry." In 1973, the JFTC similarly found that NSK, Koyo Seiko Co. (currently JTEKT), Nachi-Fujikoshi and NTN Toyo Bearing Co. (currently NTN) formed a cartel and held secret meetings at which they fixed bearings prices. In 2002, the French Conseil de la Concurrence (Competition Council) fined four bearings manufacturers €19 million for their participation in a price-fixing cartel that was active from 1993 through 1997. The cartel included

three participants in the present Bearings price-fixing cartel, Defendants SKF, Schaeffler and NSK.

193.    In the mid 1980's, the Japanese Defendants regularly colluded to fix sale prices for bearings.  During this time the executives of the Japanese Defendants engaged in telephone conferences to discuss pricing for customers and markets.

194.    The Japanese Defendants had agreements not to compete for their customers. Their sales employees were not allowed to take customers from the other Japanese Defendants. If there was an issue about prices and customers, the supervisors of the Japanese Defendants would meet to determine who from their group would sell to a given customer and what price would be charged for the sale.

195.    On June 14, 2012, the Japan Fair Trade Commission ("JFTC") filed a criminal accusation that found a criminal violation of the Japan's Antimonopoly Act against NSK Ltd, NTN Corp., and Nachi-Fujikoshi Corp.  According to the Japan Times, the three companies have raised bearing prices five times since 2004 and the JFTC believes that these price increases were the result of cartel activity.

**EC Investigation**

196.    On November 8, 2011, the European Commission ("EC") announced that it had made unannounced inspections at the premises of companies that manufacture bearings over concerns that these companies may have violated antitrust rules. JTEKT stated in its 2012 Annual Report that they are under investigation in the EU for allegaedly contravening EU law. Nachi has also admitted in its 2011 report that in November of 2011 its European subsidiary was inspected by the EC, in connection with investigations into its violation of EC competition law. NTN's report also stated that its European subsidiary was subject to an on-site inspect in

48

November 2011, by the EC.  NSK's report for the Quarter ending on June 30,2013, states that NSK's subsidiary in Germany was investigated in November 2011 in relation to the EC's investigation into anticompetitive conduct in the bearings industry.

197.    Defendants SKF and Schaeffler have admitted that their facilities were inspected by the EC.

198.    In its 2011 Annual Report, SKF explained that, along with other companies in the Bearing industry, it is "part of an investigation by the European Commission regarding a possible violation of EU antitrust rules." SKF has also acknowledged that EU officials have visited its Gothenburg, Sweden and Schweinfurt, Germany facilities.  SKF's 2012 Annual Report stated it was likely that the EC would impose a fine on it.

199.    Schaeffler AG's 2011 Annual Report acknowledges the worldwide Bearings antitrust investigation, noting, "[t]he European Commission as well as the US Department of Justice have commenced antitrust investigations of various manufacturers of rolling bearings, including Schaeffer. The European and the U.S. competition authorities are investigating whether manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices concerning rolling or plain bearings." Schaeffler has also stated that "Several antitrust authorities have commenced investigations of several manufacturers" of bearings.

200.    Schaeffler's 2012 report states that "The EU antitrust authorities are conducting further close examinations; the Schaeffler Group expects further steps in the proceedings in 2013."

**Investigations in South Korea, Singapore and Australia**

201.    NTN's 2012 Annual Report also indicated that in July 2012 the Korean Fair Trade Commission conducted an on-site investigation of an NTN subsidiary, in connection with

its investigation into the bearings conspiracy.  NSK's most recent quarterly report states that in

July 2012, its South Korea subsidiary underwent an on-site inspection from the Korea Fair Trade

Commission on suspicion of a violation of the Monopoly Regulation and Fair Trade Act in

connection with the bearings business.  SKF's 2012 report states that it is also being investigated

by the Korean Fair Trade Commission.

202.    The Top Message on NTN's website states that the company's Singapore

subsidiary underwent an on-site investigation in the fiscal year ending on March 31, 2013,  as

part of the bearings investigation by Singapore authorities.  NSK's report for the quarter ending

on June 30, 2013, stated that in February 2013, its subsidiary in Singapore was investigated by

that country's competition commission.

203.    On July 15, 2013, the Australian Competition and Consumer Commission

("ACCC") announced it had instituted civil proceedings in the Australian Federal Court against

Koyo Australia Pty Ltd. (Koyo) – sister company of Defendant Koyo - for alleged cartel conduct

relating to the supply of ball and roller bearings for use in motor vehicles.  The ACCC alleges

that Koyo and at least two of its competitors made and gave effect to cartel arrangements for an

increase to the price of Bearings.

**D.    Government Fines**

204.    Nachi's 2012 Business Report confirms that on December 28, 2012, Nachi and

two of its executives were convicted in Tokyo District Court of violating Japan's Antimonopoly

Act.  Keiichi Ogino, a former member of the board of directors, was sentenced to fourteen

months in prison and suspended for three years, and Michio Murai, a former deputy chief of the

bearings division, was sentenced to twelve months and also suspended for three years.  The

Tokyo District Court also issued a 180 million yen  criminal fine against Nachi-Fujikoshi.

50

205.    On February 25, 2013, Defendant NSK Ltd. announced that the company was sentenced to a penalty of 380 million yen by the Tokyo District Court for violation of the Antimonopoly Act of Japan regarding sales of Bearings as a result of the June 14, 2012 prosecution by the Tokyo District Public Prosecutors Office.  In addition, two of NSK's former officers and a former employee received suspended sentences.  Keisuke Takagawa and Katsumi Kuwabara, former senior vice presidents, were sentenced to fourteen months in prison, while Yoshi Nishiyama, was sentenced to twelve months.

206.    On February 25, 2013, Nikkei Japan Business Newspaper reported that the presiding judge stated, "[t]he crime is malicious – large in scope and carried out systematically. Having the largest market share, NSK carried out the central role in this cartel."

207.    On March 29, 2013 the JFTC issued Cease and Desist Orders against NTN Corp., NSK , Ltd. and Nachi-Fujikoshi Corp, based on their violation of the Antimonopoly Act, through participation in a conspiracy to fix the prices of bearings.  All three companies were required to pay fines totaling ¥13.36 billion.

208.    JTEKT was also mentioned as a violator, but was not subject to a fine or cease and desist order, due to its leniency status.

209.    The Order stated that the violators agreed "to raise their selling prices of automotive bearings."

210.    JTEKT announced on July 13, 2013, that on July 12, 2013, it was ordered by the Quebec Superior Court of Justice to pay a $5 million fine for violating the Canadian Competition Act.  It stated that it cooperated with the Canadian Competition Bureau and negotiated a plea agreement with the Bureau.  JTEKT pleaded guilty to two counts of bid-rigging.

211.    JTEKT secretly conspired with NSK to submit bids or tenders in response to requests for quotations ("RFQs").  These agreements were reached, at least in part, through direct communications between JTEKT sales management level personnel and their counterparts at NSK, where the employees discussed, among other things, how to coordinate their respective responses.  These discussions resulted in an agreement whereby JTEKT would win certain RFQs while NSK would win others.

212.    The Canadian Competition Bureau's press release regarding the fine stated that "The Bureau became aware of the bearings cartel by way of its Immunity Program. Under the Immunity Program, the first party to disclose to the Bureau an offence not yet detected or to provide evidence leading to a referral of evidence to the Public Prosecution Service of Canada (PPSC) may receive immunity from the PPSC, provided that it fully cooperates with the Bureau's investigation and any ensuing prosecution. Subsequent cooperating parties may receive lenient treatment under the Bureau's Leniency Program. These programs provide powerful incentives for organizations and individuals to come forward and cooperate with the Bureau's investigations. JTEKT participated in the Bureau's Leniency Program and provided substantial assistance to the Bureau and the PPSC.

**E.      Criminal Pleas in the United States Related to Conspiracies in the Automotive Parts Industry**

213.    A number of other manufacturers of other automotive parts have pleaded guilty, or agreed to plead guilty, to price fixing and bid rigging in the automotive parts industry, including: Furukawa Electric Co., Ltd.; Yazaki Corp.; G.S. Electech, Inc.; Fujikura Ltd.; Denso Corporation; Autoliv, Inc., and TRW Deutschland Holdings, GmBH, and Nippon Seiki Co. Ltd. These companies have pleaded guilty to engaging in price-fixing conduct with regard to Automotive Wire Harness Systems, Instrument Panel Clusters, Fuel Senders, Occupant Safety

Systems and Heater Control Panels.  These violators have paid almost $1 billion in fines. The majority of these violators pleaded guilty to engaging in bid-rigging, price-fixing, and market allocation during the same time period as the Class Period of the Bearings conspiracy, with multiple OEMs as their targets.

       **F.**      **Likely Existence of An Amnesty Applicant**

      214.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party who has been accepted into the DOJ's ACPERA program as an amnesty applicant.  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

      215.    In light of the multiple guilty pleas in related automotive parts antitrust cases, the DOJ's ongoing investigation into the industry, the fine paid in Canada by JTEKT (as well as JTEKT's admission of its participation in the price-fixing conspiracy), and the existence of an amnesty applicant in the JFTC proceedings, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

       **G.**      **Damage to Plaintiffs and Class Members Caused by Defendants' Illegal Activities.**

      216.    Deputy Assistant Attorney General Scott Hammond, recently stated that the automotive parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."

217.     Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Bearings from them and in those purchasers raising their prices to subsequent purchasers.

218.     Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Bearings they sold to Plaintiffs and the Classes, firms who sold such Bearings and vehicles passed Defendants' overcharges on to Plaintiffs and the Classes.

219.     Plaintiffs and the Classes are entitled to the overcharges they paid for Bearings.

220.     Because, among other reasons, of the imperfect nature of competition among automobile dealers and the differentiation among such dealers by brand and by location, Plaintiffs and the Classes had to and did absorb, at the very least, a significant portion of the overcharges that they paid due to Defendants' illegal activities.

221.     Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

222.     Plaintiffs[2] bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that during the Class Period, (a) purchased Bearings manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Bearings manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

---

[2] Plaintiff Dale Martens is not included in the Nationwide Class.

223.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."   These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers in the Indirect Purchaser States, that, during the Class Period (a) purchased Bearings manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Bearings manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

224.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities, and instrumentalities of the federal government, states, and their subdivisions, agencies, and instrumentalities.

225.     Although Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class.

226.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Bearings sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Bearings sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

227.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct because they paid artificially inflated prices for Bearings purchased indirectly from Defendants or their co-conspirators.

228.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

229.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

230.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism provide injured entities with a method for obtaining redress for claims that might not be practicable to pursue individually and substantially outweigh any difficulties that may arise in the management of this class action.

231.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

232.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Bearings;

(b)    The prices of Bearings have been fixed, raised, maintained, or stabilized at artificially inflated levels;

57

(c)     Defendants charged purchasers of their Bearings inflated, fixed and stabilized prices for such Bearings;

(d)     Firms who sold Defendants' Bearings and vehicles to Plaintiffs and the Classes passed Defendants' overcharges  on to them;

(e)     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

(f)     Bearing dealers purchasing Bearings and vehicles containing Bearings have been deprived of free and open competition and have paid inflated prices for Bearings.

233.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Bearings, as a result of Defendants' conspiracy.

234.    An increase in the prices of Bearings caused an increase in the prices of vehicles during the Class Period.

235.    The market for Bearings and the market for cars are inextricably linked and intertwined because the market for Bearings exists to serve the vehicle market.  The Bearings at issue in this complaint, have no independent utility and little to no value, aside from their value as vehicle components. The Bearings at issue in this complaint, must be inserted into vehicles to serve any function.  Indeed, the demand for vehicles creates the demand for Bearings. As stated in a report by a leading economic research firm,

> Ball bearing manufacturers rely heavily on several key industries to purchase their products. For example, automotive and transportation manufacturers are major purchasers of Automotive Bearings. Therefore, the collapse of the domestic automotive industry throughout 2008 and 2009 caused demand for new cars to plummet, which reduced demand for Automotive Bearings used in the auto manufacturing process.

236.    Bearings are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle and are not altered during the manufacturing process.  As a result, Bearings follow a traceable physical chain of distribution from the

58

Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Bearings can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

237.    Just as Bearings can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Bearings affect prices paid by indirect purchasers of new motor vehicles containing Bearings.

238.    Bearings have their own part numbers, which permit them to be tracked.

239.    Bearings are pieces of sophisticated equipment that are necessary to operate a vehicle.

240.    Bearings are found in every modern vehicle and can be removed from a finished vehicle and replaced.

241.    The Bearings at issue in this lawsuit only have one use: to be inserted into vehicles.

242.    Bearings comprise a not insignificant portion of the cost of a vehicle.

243.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Bearings and, as a direct and foreseeable result, the price of new motor vehicles containing Bearings and the price of Bearings purchased for repair purposes. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Bearings on prices for new

59

motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Bearings affects changes in the price of new motor vehicles. In such models, the price of Bearings would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Bearings impact the price of new motor vehicles containing Bearings while controlling for the impact of other price-determining factors.

244.    The precise amount of the overcharge impacting the prices of new motor vehicles containing Bearings can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

245.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Bearings than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiffs' and Class members' damages are measureable.

**PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

A.      **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover the Claims**

246.    Plaintiffs repeat and reallege the allegations set forth above.

247.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims

set forth herein, until the public announcements of the government investigations into Bearings price-fixing began in July 2011.

248.    Plaintiffs and the members of the Classes purchased automobiles  or purchased Bearings to replace or repair damaged or defective Bearings.

249.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in July 2011 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix Bearings.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

250.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

251.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Bearings price-fixing began.

252.    Because Defendants' agreements, understandings and conspiracies were kept secret until July 2011, Plaintiffs and members of the Classes were unaware before that time of

Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Bearings throughout the United States during the Class Period.

253.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

254.    Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss the price-fixing and bid-rigging conduct they engaged in to carry out their conspiracy.

255.    By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Bearings are not exempt from antitrust regulation, and thus, before July 2011, Plaintiffs reasonably considered the Bearings industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Bearings prices before July 2011.

256.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

257.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 2011, when

reports of the investigations into anticompetitive conduct concerning Bearings were first publicly disseminated.

258.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

259.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

260.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

261.    At least as early as January 1, 2004, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Bearings, thereby creating anticompetitive effects.

262.    The anticompetitive acts were intentionally directed at the United States market for Bearings and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Bearings throughout the United States.

63

263.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Bearings.

264.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Bearings have been harmed by being forced to pay inflated, supracompetitive prices for Bearings and vehicles containing Bearings.

265.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

266.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Bearings has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Bearings sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States;

(c)    Prices for vehicles purchased by Plaintiffs and the members of the Nationwide Class containing Bearings manufactured by Defendants and their coconspirators were inflated; and

(d)    Plaintiffs and members of the Nationwide Class who purchased Bearings indirectly from Defendants have been deprived of the benefits of free and open competition.

267.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Bearings and vehicles containing Bearings than they would have paid and will pay in the absence of the conspiracy.

268.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, which will deprive Plaintiffs and members of the Nationwide Class of

the benefits of free competition, including competitively-priced Bearings and vehicles containing Bearings.

269.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Bearings and vehicles containing Bearings because they are required to purchase vehicles and Bearings to continue to operate their businesses.

270.    Plaintiffs and members of the Nationwide Class continue to purchase vehicles and Bearings, on a regular basis.

271.    Vehicles and Bearings continue to be sold at inflated and supracompetitive prices.

272.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

273.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

274.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

275.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

276.    From as early as January 1, 2004 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Bearings in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

277.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Bearings in the United States.

278.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

        (a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Bearings at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Bearings sold in the United States;

        (b)    allocating customers and markets for Bearings in the United States in furtherance of their agreements; and

        (c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

279.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Bearings.

280.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

281.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open

66

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

282.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)      During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Bearings at supracompetitive levels.

(b)      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Bearings.

(c)      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do,

67

including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Bearings; and (2) Allocating among themselves the production of Bearings.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Bearings has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Bearings sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Bearings or vehicles containing Bearings manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

283.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Bearings or vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Bearings or vehicles in the District of Columbia, paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings, including in the District of Columbia.

(b)      During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

284.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)      Defendants' unlawful conduct had the following effects: (1) Bearings' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Bearings' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4)

69

Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

285.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

70

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[3]

286.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

---

[3] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action. Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

287.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(b)      Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

288.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Maine; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition: and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)       During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

289.       Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

290.     Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

74

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

291.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Bearings or vehicles in Mississippi were deprived of free and open competition, including in Mississippi: and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Bearings or vehicles in Mississippi paid supracompetitive, artificially inflated prices for Bearings, including in Mississippi.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

292.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

293.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or

purchased Bearings or vehicles in Nevada, were deprived of free and open competition including

in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in

Nevada and/or purchased Bearings or vehicles in Nevada, paid supracompetitive, artificially

inflated prices for Bearings and vehicles containing Bearings, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, Plaintiffs and

members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§

598A.010, *et seq.*

294.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings

price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2)

Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period Defendants' illegal conduct substantially affected New

Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

295.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and

members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

296.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Bearings or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Bearings when they purchased, including in New York, Bearings or vehicles containing Bearings, or purchased, including in New York, Bearings or vehicles that were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase Bearings or vehicles that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above

79

is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

297.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Bearings and vehicles including in North Carolina.

(b)    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

298.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

299.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

81

(b)   During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

300.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Bearings or vehicles in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased vehicles or Bearings in South Dakota, paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings including in South Dakota.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

82

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

301.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Bearings or vehicles in Tennessee, were deprived of free and open competition including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased Bearings or vehicles in Tennessee, paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings including in Tennessee.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

302.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Utah; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

303.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

84

(a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)    During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.* Plaintiffs are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

304.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Bearings or vehicles in West Virginia, were

85

deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased vehicles or Bearings in West Virginia, paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

305.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

86

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

306.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid more for Bearings and vehicles containing Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

307.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

308.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes
### on behalf of Plaintiffs and the Damages Class

309.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

310.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

311.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Bearings were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)    Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

88

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

312.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed Bearings in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein,

89

constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

(e)      Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)      Defendants' acts or practices are unfair to purchasers of Bearings (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)      Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout California; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Bearings or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Bearings or vehicles in California, paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Bearings (or vehicles containing them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

313.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

91

(c)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d)     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Bearings.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

(e)     Moreover, Plaintiffs lacked any meaningful choice in purchasing Bearings because they were unaware of the unlawful overcharge and because they had to purchase Bearings in order to be able to operate their vehicles .

(f)     Defendants' conduct with regard to sales of Bearings, including their illegal conspiracy to secretly fix the price of Bearings at supracompetitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(g)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(h)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in that such conduct, *inter alia*, resulted in a gross disparity

92

between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Bearings, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Bearings.

(i)     As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.,* and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

314.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Florida; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

315.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Bearings were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Bearings.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Bearings because they were unaware of the unlawful overcharge and because they had to purchase Bearings in order to be able to operate their vehicles.  Defendants' conduct with regard to sales of Bearings, including their illegal conspiracy to secretly fix the price of Bearings at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(c)      The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A.§ 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the

Damages Class and the prices paid by them for Bearings as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Bearings.

(d)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

316.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

95

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Bearings they had purchased as replacements and inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Bearings were misled to believe that they were paying a fair price for Bearings or the price increases for Bearings were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Bearings in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles and Bearings in New York, paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings, and were subjected to Defendants' deceptive practices.

(f)      Defendants knew that their unlawful trade practices with respect to pricing Bearings would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)      Defendants knew that their unlawful trade practices with respect to pricing Bearings would have a broad impact, causing class members who indirectly purchased Bearings to be injured by paying more for Bearings than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)      During the Class Period, Defendants marketed, sold, or distributed Bearings in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(i)      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed Bearings in New York.

(j)      Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

317.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)      Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries

97

to purchasers of Bearings and vehicles , and broad adverse impact on the public at large, and
harmed the public interest of North Carolina purchasers in an honest marketplace in which
economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers of
Bearings in North Carolina: (1) Bearings price competition was restrained, suppressed, and
eliminated throughout North Carolina; (2) Bearings prices were raised, fixed, maintained, and
stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the
Damages Class, including those who resided in North Carolina and/or purchased Bearings or
vehicles in North Carolina, were deprived of free and open competition including in North
Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in
North Carolina and/or purchased Bearings or vehicles in North Carolina, paid supracompetitive,
artificially inflated prices for Bearings and vehicles containing Bearings including in North
Carolina.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North
Carolina commerce and purchasers of Bearings and vehicles.  Defendants' price-fixing
conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their
illegal acts.  Secrecy was integral to the formation, implementation and maintenance of
Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-
concealing actions, of which Plaintiffs could not possibly have been aware.  Moreover,
Defendants deceptively concealed their unlawful activities by conducting meetings and
conversations in secret.

(e)      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed Bearings in North Carolina.

(f)      Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

318.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

319.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Bearings.  Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' Bearings prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Bearings and vehicles containing Bearings.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices

as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Bearings, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Bearings at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### on behalf of Plaintiffs and the Damages Class

320.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

321.     Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*. Plaintiffs also bring this claim under the laws of Missouri, Massachusetts and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those three states.

322.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Bearings.

323.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Bearings.

324.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

325.     Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased vehicles containing Bearings and Bearings subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.     Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  August 21, 2013.

Respectfully submitted,

/s/  *Gerard V. Mantese*
Gerard V. Mantese
(Michigan Bar No. P34424)
David Hansma
(Michigan Bar No. P71056)
Brendan Frey
(Michigan Bar No. P70893)
Mantese Honigman Rossman and
Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com

Shawn M. Raiter
Paul A. Sand
Larson • King, LLP

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker

2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

Suite 801
St. Louis, MO  63101
Telephone:  (314) 226-1015
mflannery@cuneolaw.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

*Attorneys for Dealership Plaintiffs*